## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ERIC BRUCE STOKES**,

      Plaintiff,

    vs.                            No. 07cv 745 MCA/WDS

**GARDNER ZEMKE COMPANY**,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant's Motion and Memorandum in Support of Summary Judgment* [Doc. 45], filed March 28, 2008.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion as to Count I of *Plaintiff's First Amended Complaint for Damages* and declines to exercise supplemental jurisdiction over the state-law claims asserted in Counts II and III.

## I. BACKGROUND

The following facts are taken from *Plaintiff's First Amended Complaint for Damages* [Doc. 30] or are undisputed by the parties and, thus, are accepted as true for purposes of Defendant's summary-judgment motion.

Defendant Gardner Zemke is a construction company based in Albuquerque, New Mexico, and performs electrical work throughout the western United States, including the

State of Washington.  On January 24, 2005, Defendant hired Plaintiff Eric Stokes as an electrical apprentice.  The job of electrical apprentice is physically intense, and includes lifting large pieces of material or equipment weighing up to 100 pounds, and pulling heavy conduit or wire or other objects.  On February 7, 2005, Defendant sent Mr. Stokes to a construction jobsite at Grand Coulee Dam, in the State of Washington.  Over the next two months, Mr. Stokes worked at two dam projects, Grand Coulee Dam and Chief Joseph Dam.

On or about March 20, 2005, Mr. Stokes was injured when he struck his right shoulder on a copper bus bar.  According to Mr. Stokes, he reported the injury to the supervisor who was present at the scene, and although the supervisor was supposed to, he did not inform the site superintendent.  In any event, when his shoulder began causing him severe pain, Mr. Stokes himself went to the site superintendent and advised that he needed to see a doctor.  On or about March 24, 2005, Mr. Stokes went to the Grand Coulee Medical Center where he saw Dr. Jacob Chaffee.  Dr. Chaffee had an X-ray taken, but saw no broken bones.  Suspecting that the shoulder was just bruised, Dr. Chaffee prescribed muscle relaxants and pain killers and instructed Mr. Stokes not to work for three days and to return in ten days if his shoulder did not feel better.

Mr. Stokes subsequently returned to the medical center and was again told (though by a different doctor) that his shoulder appeared to be bruised or sprained.  Mr. Stokes continued working as an electrical apprentice through the end of April 2005.  On April 25, 2005, Mr. Stokes again saw Dr. Chaffee, who reported to Defendant that Mr. Stokes's

shoulder was not responding to therapy and that Mr. Stokes should be allowed to return to Albuquerque for medical care.  In April 2005, Mr. Stokes returned to Albuquerque and began receiving workers' compensation benefits.  From April 25, 2005 until July 29, 2005, Mr. Stokes neither worked for nor was paid by Defendant.

The State of Washington Department of Labor ("DOL") contracts with a private firm, Veracity Consulting Vocational Services, to perform its workers' compensation responsibilities. In the spring of 2005, Veracity contacted Gardner Zemke regarding Plaintiff's medical condition, possibilities for light duty work, and his ultimate release to work as an electrical apprentice.

On May 13, 2005, Mr. Stokes saw Dr. Robert Vitek in Albuquerque.  Dr. Vitek is not an employee of Defendant or of Veracity; he is employed by Presbyterian Healthcare Services.  Dr. Vitek examined Mr. Stokes and recommended that he go back to work with the following restrictions: 10-pound lifting with his right hand only, no reaching above shoulder level, and no ladder climbing.  Dr. Vitek also ordered an MRI, which was done on May 27, 2005 and revealed a possibility of degenerative joint disease of the acromioclavicular joint.  Mr. Stokes returned to Dr. Vitek on June 1, 2005, at which time Dr. Vitek increased Mr. Stokes's lifting capacity to 20 pounds and referred him to Dr. Paul Legant, an orthopaedist.  Through his deposition, Mr. Stokes testified that Dr. Legant told him "[t]hat it was all in [Mr. Stokes's] mind [and that Dr. Legant] couldn't find anything that was wrong." [Doc. 45; Exh. A, Feb. 25, 2008 depo. of Eric Stokes at 58].

On July 5, 2005, Defendant's Human Resources ("HR") Director, Nancy Reisbeck, sent Mr. Stokes a letter offering him the position of receptionist. The letter begins:

> I am pleased to offer you employment with The Gardner Zemke Company, which will accommodate your current physical capacities. The job is that of Receptionist. This job is a position which this company has on a regular basis and which is reasonably expected to continue in the future.

[Doc. 46; Exh. A to affidavit of Nancy Reisbeck]. On the same day that he accepted the offer, Mr. Stokes wrote to Ms. Reisbeck, asking the following questions:

> (1) If I accept does that mean I will no longer be an apprentice?
>
> (2) Is this position permanent or just until I am done with all the doctor visits, therapy, or whatever else they need to do?
>
> (3) And if it is temporary what happens after I'm healed?

[Id.; Exh. B to Reisbeck affidavit]. In response to Mr. Stokes's first question, Ms. Reisbeck wrote:

> You are an apprentice, but may not do the work of an apprentice until released to work as an apprentice by your doctor. If so released, and if an apprentice position is available, you could work as an electrical apprentice.

In response to Mr. Stokes's second question, Ms. Reisbeck explained:

> The Receptionist job is one that is reasonably expected to continue to be available in the future. This position is available in varying locations where Gardner Zemke has projects consistent with your job of injury. In other words, when the construction project is completed in Coulee, the Receptionist position may shift to a new locale. Positions migrate naturally to where project work is available.

4

[Id.; Exh. C to Reisbeck affidavit].  It is undisputed that Mr. Stokes understood that he would have to return to work as an electrical apprentice if released by his physician to do so. [See Doc. 45 at 5; Doc. 51 at 4].

Mr. Stokes accepted the offer to work in the receptionist position.  However, before reporting for work on or about July 27, 2005, he again saw Dr. Vitek on July 22, 2005.  Dr. Vitek's notes from the visit reflect that Mr. Stokes was moving to Washington, and that he was released to return to work as of that same day so long as he did not exceed a 20-pound lift and push/pull restriction. [Doc. 45; Exh. B, March 6, 2008 depo. of Robert Vitek, MD, attached Progress Note].  Because Mr. Stokes was moving out of state, Dr. Vitek at that time discharged him as a patient. [Id.].  Mr. Stokes confirmed that he advised Dr. Vitek that, once back in Washington, he was going to seek a second medical opinion. [Doc. 45; Exh. A, Stokes depo. at 58].

On July 29, 2005, Veracity faxed to Dr. Vitek a copy of the job analysis for the position of electrical apprentice and asked Dr. Vitek to provide the objective findings that supported Mr. Stokes's limitations.  Dr. Vitek did so; he also checked off the box next to the statement, "I agree the injured worker can perform the described job with modifications as listed." [Id.; Exh. 6].

At the apparent request of the Washington DOL, Veracity again faxed Dr. Vitek on August 1, 2005 to clarify Dr. Vitek's recommendations.  The following narrative was presented to Dr. Vitek:

> Mr. Stokes is released to return-to-work in the capacity of his job of injury Electrician Apprentice, with the stipulation that he is not required to lift more than 25-pounds with his Right arm. Mr. Stokes is released to perform lifting activities, as per the job analysis, Electrician Apprentice, prior presented to you, within the 51-75 pound range, so long as he is lifting with both upper extremities.  He is further released to lifting of up to 50 pounds with his Left arm.  You further indicated that you are unable to provide any findings beyond the subjective decreased range of motion and subjective pain complaints; however, said restrictions are appropriate given these complaints and in your medical judgment these restrictions are substantiated.

Dr. Vitek confirmed Veracity's accurate understanding of these recommendations by circling "Yes" at the bottom of the paragraph.  [Doc. 45; Exh. B, Vitek depo; Exh. 7].

Mr. Stokes worked in the receptionist position for approximately 9 or 10 days before leaving on a previously scheduled, week-long Alaskan cruise from August 10-18, 2005.  On August 3, 2005, however, Mr. Stokes returned to Dr. Chaffee for a second opinion, primarily because he disagreed with what the orthopaedist, Dr. Legant, had told him.  According to Mr. Stokes, Dr. Chaffee disputed Dr. Legant's findings.  However, Mr. Stokes did not obtain a copy of Dr. Chaffee's conclusions at that time, since he "just didn't . . . feel the need to" ask for one.  [Doc. 45; Exh. A, Stokes depo. at 61].  Later that same day, Mr. Stokes received a fax from  Roberta Robles of Defendant's HR department.  The fax included a memo from Ms. Reisbeck, in which she explained to Mr. Stokes that (1) the Washington DOL had closed his workers' compensation claim; (2) Dr. Vitek had released him for work as an electrical apprentice with lifting restrictions; and (3) he was return to work as an electrical apprentice effective August 4, 2005. [Doc. 46; Exh. E to Reisbeck affidavit].

On August 8, 2005, Ms. Robles sent Mr. Stokes another fax, which began as follows:

> I understand that you question if we understood the restrictions that were placed on you.  I was told that Washington would be sending you via mail the copies of their assessment to release you to the job of injury with the exception of the one arm lifting restriction.  So in response I am faxing a copy of the assessment to you so you can see where Gardner Zemke's directive is coming from.

[Doc. 46; Exh. F to Reisbeck affidavit].  A four-page explanation supporting the decision to return Mr. Stokes to the job of electrical apprentice followed.  On the cover sheet, Ms. Robles asked Mr. Stokes to contact her as soon as he received the fax.  Though his deposition, Mr. Stokes testified that he called Ms. Robles and told her he received only the first page. [Doc. 45; Exh. A at 113].  A *Transmission Verification Report*, however, reveals that a five-page fax successfully went through to Mr. Stokes's fax number. [See Doc. 46; Exh. F to Reisbeck affidavit].  In any event, Mr. Stokes understood that by its August 3 and August 8, 2005 correspondences, Defendant was telling him to return to work as an electrical apprentice. [Doc. 45 at 6; Doc. 51 at 4].

Mr. Stokes refused to return to work on the ground that he "was not physically able to return to the job of injury." [Doc. 45; Exh. A, Stokes depo. at 119].  It is Mr. Stokes's contention "that he was [not] appropriately medically released to return to work as an electrician apprentice, as Dr. Vitek had not seen him with regard to this and was not his doctor."[1] [Doc. 51 at 4].  By Mr. Stokes's own admission, however, he had seen Dr. Vitek

---

[1]  Through his deposition, Mr. Stokes further explained that he "told [Defendant he] thought [Dr. Vitek's release] wasn't valid because he was no longer [Mr. Stokes's] doctor."

"four or five times" since first being injured; those visits included one on July 22, 2005, which was just one week before Dr. Vitek advised Veracity that Mr. Stokes was able to return to the job of injury with restrictions. [See Doc. 45; Exh. A, Stokes depo. at 57; Exh. B, Vitek depo. at 17;  Exh. 6 to Vitek depo.].  In any case, Mr. Stokes did not provide Defendant with any documentation from the doctor he *did* consider his physician, Dr. Chaffee, supporting his (Mr. Stokes's) belief as to his physical condition and/or contradicting Dr. Vitek's conclusions.  Defendant terminated Mr. Stokes on August 22, 2005 because "[he] felt he could not work after being released to [the] job of injury." [Doc. 46; Exh. G to Reisbeck affidavit].

On November 28, 2007, Mr. Stokes, through counsel, filed *Plaintiff's First Amended Complaint for Damages* [Doc. 30],[2] alleging unlawful discrimination in violation of the Americans with Disabilities Act ("ADA") (Count I); breach of contract (Count II); and breach of the implied covenant of good faith and fair dealing (Count III). [Doc. 30]. Defendant filed its motion for summary judgment on March 28, 2008, arguing, in pertinent part, that Mr. Stokes is not disabled for purposes of the ADA. [See generally Doc. 45].

---

[Doc. 45; Exh. A, Stokes depo. at 74].

[2] Mr. Stokes had originally filed a *pro se* Complaint in the Second Judicial District Court, Bernalillo County, which Defendant removed to this Court. [See Doc. 1].

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Id. Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See Celotex, 477 U.S. at 324. It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party,

and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

It bears noting that "[w]hen a case turns on the intent of one party, as employment discrimination claims often do, a 'trial court must be cautious about granting summary judgment.'"  Douglas v. Victor Capital Group, 21 F.Supp.2d 379, 388 (S.D.N.Y. 1998) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2nd Cir. 1994)).  Since it is unlikely that the employer has left direct evidence of discriminatory intent, "the Court must carefully comb the available evidence in search of circumstantial proof to undercut the [employer's] explanations for its actions."  Id.  "Nonetheless, when the defendant provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the defendant."  Id.

## B. The Americans with Disabilities Act ("ADA") and Mr. Stokes's Claims Thereunder

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  To establish a prima facie case of discrimination under the ADA, a plaintiff must show that (1) he is "disabled" within the meaning of the ADA; (2) he is qualified, with or without reasonable accommodation, to perform the essential functions of the job he holds

or desires; and (3) his employer discriminated against him because of his disability.  See

Jones v. U.P.S., Inc., 502 F.3d 1176, 1189 (10th Cir. 2007).

In this case, Mr. Stokes appears to assert both that he was discriminated against by

being wrongfully terminated and that he was denied a reasonable accommodation.  [Doc. 30

at 4].[3]  Although the elements of a failure-to-accommodate claim differ slightly from those

of a wrongful-termination claim,[4] both claims require a plaintiff to demonstrate, as the first

step in making his prima facie showing, that he was disabled within the meaning of the

ADA.  For purposes of the ADA, a "disability" is (1) a physical or mental impairment that

substantially limits one or more of the major life activities of such individual; (2) a record

of such an impairment; or (3) being regarded as having such an impairment.  42 U.S.C.

§ 12102(2).

A "physical impairment" is "[a]ny physiological disorder, or condition, cosmetic

disfigurement, or anatomical loss affecting one or more of the following body systems:

---

[3]  In his *Amended Complaint*, Mr. Stokes maintains:

> Plaintiff was treated differently in the terms and conditions of his
> employment because of his Disability. Plaintiff was denied a
> reasonable accommodation, and ultimately terminated because of his
> disability. Such action by the Defendant constitutes a violation of The
> Americans with Disabilities Act.

[Doc. 30 at 4].

[4]  For a failure-to-accommodate claim, the plaintiff must establish, as the third element of
his prima facie case, that his employer did not take reasonable steps to reassign him to a vacant
position or a position the employer reasonable anticipated would become vacant in the fairly
immediate future.  Bartee v. Michelin N. Am., Inc., 374 F.3d 906, 912 n.4 (10th Cir. 2004).  The
first two elements (disabled and qualified) for a claim of failure to accommodate are the same as
those for a claim for wrongful termination.  Id. at 912.

neurological, musculoskeletal, special sense organs, respiratory (including speech organs) . . . cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine. . . ." 29 C.F.R. § 1630.2(h)(2). An impairment is "substantially limiting" if, as a result, an individual is

> [u]nable to perform a major life activity that the average person in the general population can perform; or . . . [s]ignificantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(I). Determining whether an impairment is substantially limiting requires the Court to consider the (1) nature and severity of the impairment; (2) duration or expected duration of the impairment; and (3) permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. Id.; see also 29 C.F.R. § 1630.2(j)(2). The Court also considers the effects of corrective or mitigating measures, both positive and negative, on the impairment. Doyal v. Oklahoma Heart, Inc., 213 F.3d 492, 496 (10th Cir. 2000).

A "major life activity" is a "basic activity that the average person in the general population can perform with little or no difficulty. . . . The touchstone for determining an activity's inclusion under the statutory rubric is its significance." Pack v. Kmart Corp., 166 F.3d 1300, 1305 (10th Cir.), cert. denied, 528 U.S. 811 (1999). "Major life activities include such functions as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, sleeping, sitting, standing, lifting, reaching, and working."

Doyal, 213 F.3d at 495-96.   Finally,

> [w]ith respect to the major life activity of working . . . [t]he term
> substantially limits means significantly restricted in the ability
> to perform either a class of jobs or a broad range of jobs in
> various classes as compared to the average person having
> comparable training, skills and abilities. The inability to perform
> a single, particular job does not constitute a substantial
> limitation in the major life activity of working.

29 C.F.R. 1630.2(j)(3)(I).  Armed with this fuller understanding of the law, the Court now

turns to the particular facts of this case.

The initial question for this Court's consideration is whether Mr. Stokes has raised

a genuine issue of material fact as to whether he is disabled for purposes of the ADA, either

because he has a physical impairment that substantially limits him or because Defendant so

regarded him.

In an ADA case factually similar to the case at bar, the District Court for the Northern

District of Mississippi entered summary judgment for the defendant/employer on the ground

that the plaintiff/former employee had failed to show that he was disabled for ADA purposes

where "[h]e ha[d] presented absolutely no medical reports or other objective evidence

substantiating his claim that an injury and subsequent surgery had left him with a condition

which r[ose] to the level of a physical impairment.  Farley v. Gibson Container, Inc., 891

F.Supp. 322, 326 (N.D.Miss. 1995).  The plaintiff was terminated when he failed to return

to work after leaving because of continuing health problems.  Id. at 324.  While his employer

did not dispute that the plaintiff had undergone surgery, it argued that he had presented "no

medical evidence to support his complaints of not being able to 'work on nothing heavy' or

to 'pick up like [he] did [before the surgery].'" <u>Id.</u> at 325.

Concluding that the plaintiff had failed to raise a genuine issue of material fact showing that he suffered from a "physical impairment" within the meaning of the ADA, the court held "significant" the complete lack of any supporting medical evidence, and explained that "[t]o hold otherwise would render the requirement of a physical impairment superfluous and meaningless and would allow anyone with any kind of condition, regardless of the severity, to claim a physical impairment." <u>Farley</u>, 891 F.Supp. at 326. In so doing, the <u>Farley</u> court joined a number of other courts that consider "a lack of medical testimony [as] a factor cutting against a plaintiff's claim of disability." <u>Marinelli v. City of Erie, Pa.</u>, 216 F.3d 354, 360 (3rd Cir. 2000) (given "other weaknesses" in plaintiff's disability claim, fact that he "did not produce a shred of medical evidence to substantiate his allegations of impairment" militated in favor of defendant's position that plaintiff had failed to satisfy burden of demonstrating disability); <u>see also</u> <u>Maulding v. Sullivan</u>, 961 F.2d 694, 698 (8th Cir. 1992) (plaintiff's failure to support her allegations of disability with "adequate medical documentation" prevented her from sustaining her "burden to show she [was] a handicapped person under the Rehabilitation Act"); <u>Douglas</u>, 21 F.Supp.2d at 392 (entering summary judgment for defendant because plaintiff's testimony "as to the (alleged) [impairment], without supporting medical testimony, simply [was] not sufficient to establish his prima facie case under the ADA"); <u>and</u> <u>Polderman v. Northwest Airlines, Inc.</u>, 40 F.Supp.2d 456, 463 (N.D. Ohio 1999) (where only evidence of plaintiff's alleged disabling depression was her own testimony, evidence insufficient to defeat defendant's summary-judgment motion

on issue of plaintiff as "disabled" for purposes of ADA).

In light of these cases, and given that "[e]mployers should not be expected to recognize a physical impairment solely on an employee's 'say-so,'" <u>Farley</u>, 891 F.Supp. at 326, the Court determines that Mr. Stokes has failed to raise a genuine issue of material fact as to whether he suffers from a "physical impairment" within the meaning of the ADA.  As an initial matter, the Court notes that, in response to Defendant's allegation that "[o]n July 29, 2005, Dr. Vitek formally released [Mr. Stokes] to return to work as an apprentice electrician[,]" Mr. Stokes does not dispute that he was released; rather, he "disputes that Dr. Vitek was in a position to make this decision, as he was no longer his doctor and had not seen [Mr. Stokes] with regard to updating his medical release." [Doc. 45 at 5; Doc. 51 at 4]. While Mr. Stokes testified that he "thought [Dr. Vitek's release] wasn't valid because he was no longer [Mr. Stokes's] doctor[,]" [Doc. 45; Exh. A; Vitek depo. at 74], the undisputed evidence is that Dr. Vitek did indeed see Mr. Stokes just one week before clearing him to return him to work, and that Dr. Vitek had seen Mr. Stokes  "four or five times" in the four-month period since Mr. Stokes was first injured.  Moreover, Mr. Stokes testified that he knew of no reason that notes that Dr. Vitek had made documenting Mr. Stokes's visits would have been inaccurate.[5]

---

[5] [<u>See</u> Doc. 45; Exh. A, Stokes depo. at 110]:

Q: On the next page of the progress note, Dr. Vitek indicates that, "The patient is returned to work with restrictions."
    Was it your understanding after seeing Dr. Vitek that you could go back to work?
A: Not as far as I know.  I don't remember that actual

In any case, other than Mr. Stokes's own assessment of his condition (that he "didn't feel [he] was physically able to" return to work as an electrical apprentice), there is no documentation in the record to contradict Dr. Vitek's determination that as of July 29, 2005, Mr. Stokes was sufficiently healthy to return to the job of injury, at least with the outlined restrictions. According to Mr. Stokes, Dr. Chaffee disputed the findings of Dr. Legant (the orthopaedist), but Mr. Stokes also testified that he did not receive (nor did he request) a copy of Dr. Chaffee's report until after he had been terminated. Even so, there is no evidence in the record that Mr. Stokes ever brought that report to Defendant's attention. [See Doc. 45; Exh. A, Stokes depo. at 61]. "A person alleging a disability protected by the ADA has a burden of establishing with medical evidence the existence of the alleged disability, *and presenting the documentation during the term of employment not following termination.*" Kalekiristos v. CTF Hotel Mgmt. Corp., 958 F.Supp. 641, 657 (D.D.C. 1997). When asked if he had asked for a copy of the report prior to termination, Mr. Stokes replied negatively, explaining that he "just didn't . . . feel the need to." [Doc. 45; Exh. A, Vitek depo. at 61]. Because Mr. Stokes has not presented any medical documentation in support of his position that he was not physically able to return to the position of electrical apprentice, the Court concludes that he has failed to raise a genuine issue of material fact as to whether he suffered

---

conversation, no.
Q: Do you know of any reason why Dr. Vitek's progress notes would be inaccurate?
A: Not as far as I know.

from a physical impairment, as that term is used in the ADA.[6]

Even if this Court were able to say that Mr. Stokes has satisfied his burden of demonstrating a physical impairment under the ADA, it would nonetheless be constrained to conclude that he has not shown that his impairment substantially limited major life activities.  The Court first looks to whether Mr. Stokes is substantially limited in a major life activity other than working, because

> [i]f an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered. If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working.

29 C.F.R. app. § 1630.2(j).

When questioned at his deposition as to what major life functions were impaired as a result of his injured shoulder, Mr. Stokes replied, "[w]orking, driving, all kids of things . . . playing, doing weights."  [Doc. 45; Exh. A, Stokes depo. at 97].  Yet he also testified that he drives a pickup truck, which he drove to his attorney's office the morning of the deposition, and that he had not lifted weights since "[b]ack in the '70's."  Id. at 73, 97.

---

6  The Court deems significant Mr. Stokes's testimony that when Dr. Chaffee first examined him, "[h]e did an x-ray [but] didn't find any broken bones.  At the time he thought maybe it was just bruising." [Doc. 45; Exh. A, Stokes depo. at 47].  When Mr. Stokes returned to Dr. Chaffee's clinic ten days later, another doctor "examined [him] and told [him] it was probably a sprained or a bruised muscle." [Id. at 48].  The Appendix to the Regulations implementing Title I of the ADA provides, in pertinent part, that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities.  Such impairments may include, but are not limited to, . . . sprained joints. . . ." 29 C.F.R. app. § 1630.2(j) (*Interpretive Guidance on Title I of the Americans with Disabilities Act*).

17

Additionally, it is undisputed that at approximately the same time he was released to return to work as an electrical apprentice, Mr. Stokes took a week-long cruise to Alaska. Because Mr. Stokes has not demonstrated substantial limitations in major life activities other than working, the Court now considers whether he is substantially limited in that area.

"The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(I). The medical evidence of record in this case shows only that Mr. Stokes may have been temporarily limited with respect to the amount of lifting he could perform. Importantly, neither Dr. Vitek nor any of the other physicians Mr. Stokes consulted ever told Mr. Stokes to stop working completely. To be sure, Dr. Vitek testified that "[a]s of the first time [he] saw [Mr. Stokes, Dr. Vitek] never took him off of work." [Doc. 45; Exh. B, Vitek depo. at 7]. The first time Mr. Stokes saw Dr. Chaffee, Dr. Chaffee prescribed muscle relaxants, ibuprofen, and hydrocodone and gave him "a three-day note not to work. . . ." [Id.; Exh. A; Stokes depo. at 47]. Finally, the orthopaedist, Dr. Legant, was unable to "find anything that was wrong" with Mr. Stokes. [Id. at 58].

It is also important to note that, while Mr. Stokes may not have felt physically ready to return to the position of electrical apprentice, he did feel healthy enough to continue working as a receptionist for Defendant; in fact, Defendant's decision to remove Mr. Stokes from the receptionist position and place him back into the job of injury forms the basis of

Mr. Stokes's discrimination complaint.[7]  Mr. Stokes's admitted ability to work (though not, at least in his opinion, in the position of electrical apprentice) strongly cuts against any determination that Mr. Stokes is substantially limited in the major life activity of working. See 29 C.F.R. § 1630.2(j)(3)(I) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.").  The medical testimony, as well as Mr. Stokes's own readiness to work (at least in the receptionist position) constitute evidence that his shoulder injury was not substantially limiting but, rather, a temporary injury of limited severity.  See 29 C.F.R. § 1630.2(j)(3)(I).

Finally, the record evidence also is insufficient to raise a genuine issue of material fact as to whether Defendant regarded Mr. Stokes as having a disability.  If anything, the fact that Defendant directed Mr. Stokes to return to the position of electrical apprentice demonstrates that it believed he was physically capable of doing the job of injury.  See Fink v. Kitzman, 881 F.Supp. 1347, 1377 (N.D. Iowa 1995) (where employer was aware that employee had carpal tunnel syndrome and had missed work because of it, fact that employer "compelled

---

[7]  At Mr. Stokes's deposition, the following colloquy took place:

> Q: How did Gardner Zemke discriminate against you based on your alleged disability?
> A: By not allowing me to do the light duty job that they told me that they would have for me.
> . . .
> Q: You claim that Gardner Zemke discriminated against you based on your disability by not continuing to provide you light duty work.  Is that your claim?

A: Yes.

[Doc. 45; Exh. A, Stokes depo. at 66, 68].

[employee] to work overtime to make up for missed work [did] not indicate that [employer] considered her disabled; if anything, it indicate[d] that [employer] did not consider that [employee's] condition prevented her from performing any of the essential functions of her job."); see also Anderson v. Coors Brewing Co., 181 F.3d 1171, 1175-76 (10th Cir. 1999) (for purposes of determining whether employee is "qualified" under ADA to perform essential functions of job, courts look to position for which employee was actually hired).

It is for all of these reasons that the Court concludes that Mr. Stokes has failed to raise a genuine issue of material fact as to whether he is disabled for purposes of the ADA. Accordingly, Defendant is entitled to summary judgment with respect to Mr. Stoke's claims that Defendant discriminated against him in violation of the ADA.

### C. Mr. Stokes's State-Law Claims

In addition to his ADA claims, Mr. Stokes has asserted state-law claims for breach of contract and breach of the implied covenant of good faith and fair dealing. [See Doc. 30 at 4-6]. In asserting these claims, Mr. Stokes invokes the Court's supplemental jurisdiction. [See id. at 1 ("This Court has jurisdiction pursuant to the . . . American's [sic] With Disabilities Act, and over Plaintiff's pendant state law claims for Breach of Contract, and Breach of the Implied Covenant of Good Faith and Fair Dealing")]. For the reasons that follow, the Court declines to exercise its supplemental jurisdiction over Mr. Stokes's state-law claims.

Section 1367 of Title 28 of the United States Code provides, in pertinent part, that "in any civil action of which the district courts have original jurisdiction, the district courts shall

have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367(a).  Pursuant to subsection (c), however, the Court may decline to exercise its supplemental jurisdiction if, among other things, it has dismissed all claims over which it had original jurisdiction.  28 U.S.C. § 1367(c)(3).  In other words, once "the bases for federal subject matter jurisdiction have been extinguished[,] the district court may decline to exercise continuing 'pendent or supplemental jurisdiction over [the] plaintiff's state claims."  Lancaster v. Indep. Sch. Dist. No. 5, 149 F.3d 1228, 1236 (10th Cir. 1998) (dismissing without prejudice plaintiff's claims for, *inter alia*, breach of contract after having entered summary for defendant on plaintiff's First and Fourteenth Amendment claims); see also Taylor v. Meacham, 82 F.3d 1556, 1564 n.1 (10th Cir. 1996) ("Once a federal court dismisses claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over related state law claims.").

In the instant action, the entry of summary judgment in favor of Defendant on Count I extinguishes the basis for federal subject matter jurisdiction.  See Lancaster, 149 F.3d at 1236.  Accordingly, the Court declines to exercise its supplemental jurisdiction over Mr. Stokes's breach-of-contract and breach-of-implied-covenant claims.  See 28 U.S.C. § 1367(c)(3).  In so declining, the Court has considered whether the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction.  See Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995).  The Court is not convinced that these factors weigh in favor of retaining

jurisdiction.  The employment policies that are at the heart of Mr. Stokes's breach-of-contract and breach-of-implied-covenant claims are subject to evaluation under state law and, thus, best suited to adjudication in a state court.  Notions of comity and federalism demand that a state court try such claims in the first instance, absent compelling reasons to the contrary.  See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990).  In addition, the Court's decision not to exercise supplemental jurisdiction is not necessarily fatal to Mr. Stokes's state-law claims, as 28 U.S.C. § 1367(d) may provide for the tolling of any limitations period regarding these claims.  For these reasons, Mr. Stokes's claims for breach of contract and breach of the implied covenant of good faith and fair dealing will be dismissed without prejudice.  See Lancaster, 149 F.3d at 1236 (where district court had entered summary judgment for defendant on plaintiff's federal claims, affirming district court's decision to dismiss without prejudice plaintiff's state-law claims).

## III. CONCLUSION

For the foregoing reasons, the Court grants Defendant's motion for summary judgment as to Count I of *Plaintiff's First Amended Complaint for Damages*.  The Court declines to exercise its supplemental jurisdiction over Counts II and III, which are hereby dismissed without prejudice.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion and Memorandum in Support of Summary Judgment* [Doc. 45] is **GRANTED** as to Count I;

**IT IS FURTHER ORDERED** that Count I is **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that Count II is **DISMISSED WITHOUT**

PREJUDICE;

**IT IS FURTHER ORDERED** that Count III is **DISMISSED WITHOUT PREJUDICE;**

**IT IS FURTHER ORDERED** that the **PRETRIAL CONFERENCE** set for TUESDAY, July 1, 2008; the **CALL OF THE CALENDAR** set for THURSDAY, August 7, 2008; and the **JURY SELECTION/TRIAL** set for MONDAY, August 11, 2008; are hereby **VACATED**.

**SO ORDERED** this 22nd day of June, 2008, in Albuquerque, New Mexico.


**M. CHRISTINA ARMIJO**
United States District Judge

23